UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| MIKE EVANS CRANE SERVICES, LLC | CIVIL ACTION |
| VERSUS | NO. 11-1525 |
| CASHMAN EQUIPMENT CORP. | SECTION: "C" (5) |

## OPINION

This matter was tried before the Court, without a jury, on April 22, 2013, and taken under advisement. Rec. Doc. 83. Having considered the evidence and the testimony adduced at trial, the record, and the post-trial memoranda of counsel, and the law, the Court now issues its opinion in favor of the plaintiff, Mike Evans Crane Services, LLC ("MECS"), and against the defendant, Cashman Equipment Corp. ("Cashman"), for the following reasons.

### I. BACKGROUND

The following facts are largely undisputed. This case arises out of Cashman's alleged failure to pay MECS for MECS's repair services on equipment that belonged to Cashman. Rec. Doc. 1 at 1. At various times in 2010 and 2011, MECS performed services for Cashman, and MECS issued numerous invoices to Cashman in connection with those

1

services.[1] The parties had an "open account" arrangement, and MECS alleges that Cashman failed to pay its company for work done and invoiced to a total of $123,153.73. Rec. Doc. 1-1 at 2. The allegedly ordered work is identified in invoices 892, 919, 926, 947, 959, 962, 972, 974, 988, 1026, 1036 and 1090. Rec. Doc. 1, Exh. A.  The work included repairs to cranes and engines on barges.

On June 15, 2011 MECS filed its original complaint as a "Petition on Open Account" in the Louisiana State 32nd Judicial District Court for the Parish of Terrebonne. Rec. Doc. 1-1 at 2.  Thereafter, on June 28, 2011, Cashman properly removed this suit to this Court on the basis of diversity jurisdiction under 28 U.S.C. § 1332.  Rec. Doc. 1 at 2-3.  Cashman filed a counterclaim against MECS on March 19, 2012. Rec. Doc. 19.  The Court previously granted summary judgment in favor of the plaintiff on invoices 892, 919, 926, 947, 959, 962, 972, 974, 1026 and 1090. Rec. Doc. 64 at 8.

At trial, the Court heard testimony from four witnesses for the plaintiff: (1) Charlene Evans, MECS' co-owner and office manager, (2) Derrel Saucier, former Inland Marine employee and estimator, (3) William "Mike" Evans, co-owner of MECS, estimator and repairer, and (4) Jamie Guy, Cashman's corporate representative and operations manager. The defense did not put on any witnesses. Rec. Doc. 83.

---

[1] MECS began performing services for Cashman in 2007. Tr. at 11 (Charlene Evans' testimony).

## II. APPLICATION OF MARITIME LAW OR LOUISIANA OPEN ACCOUNT LAW

A preliminary matter in this case is whether the Louisiana Law on Open Account, Louisiana Revised Statute § 9:2781, or the general maritime law should be applied to this case. MECS filed its original petition on open account when it filed this case in the 32nd Judicial District Court. Rec. Doc. 1-1 at 2. When Cashman removed this case, it did so based on this Court's subject matter jurisdiction under 28 U.S.C. §1332(a) and never mentioned maritime law. Rec. Doc. 1 at 3. In MECS' pretrial memorandum, it argued that the Louisiana Law on Open Account should be applied in this instance where the parties had an open account in which a line of credit was running and services were recurrently granted over a period of time. Rec. Doc. 77 at 3. Cashman argued in its pretrial memorandum that this case should be governed by the general maritime law rather than Louisiana state law because the invoices at issue in this case were for services allegedly provided to vessels. Rec. Doc. 79 at 1. In particular, Cashman argues that the plaintiff allegedly worked on a tug boat, invoice 947, two crane barges, invoices 919, 974 and 892, and on a floating dredge, invoices 959, 962 and 1036. *Id.*

The general maritime law applies to contracts "relating to a ship in its use as such, or to commerce or navigation on navigable waters, or to transportation by sea or to maritime employment." *J.A.R., Inc. v. M/V Lady Lucille*, 963 F.2d 96, 98 (5th Cir. 1992) (quoting *Thurmond v. Delta Well Surveyors*, 836 F.2d 952, 954 (5th Cir. 1988)) (internal

3

quotation marks omitted).  It is well established that a contract to build a ship is not a maritime contract. *Kossick v. United Fruit Co.*, 365 U.S. 731, 735, 81 S.Ct. 886, 890 (1961). However, additionally, "[n]ot every contract that touches incidentally on maritime activities is a maritime contract; for maritime character to attach, 'there must be a direct and proximate juridical link between the contract and the operation of a ship'" *J.A.R., Inc.*, 963 F.2d at 98 (quoting *Theriot*, 783 F.2d at 538).  The invoices in this case relate to work done on equipment to be used in maritime activities.

The Court draws a distinction between work undertaken before a vessel is in operation and the work that was done here to repair vessels and equipment used for maritime activities, such as dredging.  A contract to repair a vessel is a maritime contract. *North Pacific S.S. Co. v. Hall Bros. Shipbuilding*, 249 U.S. 119, 129, 39 S.Ct. 221, 224 (1919); *Texaco Exploration and Production, inc. v. AmClyde Engineered Products*, 448 F.3d 760, 771 (5th Cir. 2006) (explaining that when work giving rise to the claim is repair or maintenance work on a navigable waterway performed from a vessel it is maritime).  However, the more specific determination of whether a contract is maritime or non-maritime when it has to do with repairing maritime components depends on "the nature and character" of the contract, not on its place of execution or performance. *Hoda v. Rowan Companies, Inc.*, 419 F.3d 379, 381 (5th Cir. 2005).  Maritime law is designed to protect maritime commerce. *Exxon Corp. v. Central Gulf Lines, Inc.*, 500 U.S. 603, 611, 111 S.Ct. 2071, 2076 (1991).  The

4

Court looks at the substance of the claim, not at whether the case was brought to federal court under a party's assertion of maritime law or state law in the form of the action. *Exxon Corp.*, 500 U.S. at 611; *see also Jambon & Associates, L.L.C. v. Seamar Divers, Inc.*, No. 09-2670, 2009 WL 2175980, at *6 (E.D. La. July 20, 2009) (citing a leading treatise on admiralty and maritime law for the proposition that regardless of whether the forum is a federal court sitting in diversity or on other grounds of federal jurisdiction, the applicable substantive law is the general maritime law if that is what the claim is grounded in) (internal citation omitted). Unless local interests are implicated, contracts related to maritime commerce are governed by maritime law. *Norfolk Southern Railway Co. v. Kirby*, 543 U.S. 14, 27, 125 S.Ct. 385, 395 (2004) (finding the case to be maritime rather than inherently local when the parties had not cited to local interests and the dispute was over a contract for shipping goods). A party may not elect for the application of state law. *Seamar Divers,* No. 09-2670, 2009 WL 2175980, at *6.

In the case of the work MECS performed, all of it was done to further maritime commerce by repairing equipment which was necessary to the use of vessels in maritime commerce.[2] *Exxon*, 500 U.S. at 611; *Kossick*, 365 U.S. at 735; *see also Seamar Divers, Inc.*, No.

---

[2] Some of the invoices pertain to work on the JMC5. It was owned by Cashman and rented to Inland Marine at the time at issue. The JMC5 was a barge with a crane on it. Tr. at 59. Saucier characterized it as one piece of equipment. *Id.* He explained that he was renting a dredge and that you cannot dredge without everything that was on the

09-2670, 2009 WL 2175980, at *8 (finding a case over a breach of a charter party agreement for failure to timely pay fell under the general maritime law of contracts rather than Louisiana Open Account Statute). Even the crane that MECS repaired, which operates on land, is used in maritime commerce. *Kirby*, 543 U.S. at 24 (finding that the fact that part of a maritime contract is performed on land does not alter its maritime nature). Accordingly, the Court evaluates the plaintiff's claims under the general maritime law of contracts. Attorneys fees shall not be granted in this case, under maritime law. *Texas A&M Research Foundation v. Magna Transp., Inc.*, 338 F.3d 394, 406 (5th Cir. 2003) (finding that granting attorneys fees under state law in a maritime contract dispute would interfere with uniformity under maritime law and upholding the general rule of maritime law that parties pay their own fees absent bad faith or oppressive litigation tactics) (internal quotation

---

barge. Tr. at 64. The barge and crane were used for dredge work in the south in the marsh from East Louisiana to West Louisiana. *Id.* at 59. When the work was performed on the barge, it was at "Bayou Penchant and Bayou Chene, at that intersection by the Eagle's Nest." Tr. at 61 (Saucier's testimony). Inland Marine had a charter agreement for the JMC5 and had a separate equipment lease agreement for the crane, the Manitowoc 4600. Exhibit I is a "bare boat charter" for the JMC5 barge on page 490 and an equipment lease on page 494 between Cashman and Inland. However, the two component contracts always go together because the Manitowoc crane on the JMC5 is integrated onto the barge. Tr. at 141 (Jamie Guy's testimony).

     Invoice 988 in exhibit A-9 is for work on an engine for a crane at Cashman's yard in Amelia. MECS "pulled the engine," cleaned the radiator, cleaned the crane and did some machinist work to install the engine. Tr. at 78 (William "Mike" Evans' testimony). The work done was on a land based crane at Cashman's yard in Amelia and the crane is used in maritime commerce. Tr. at 79.

marks omitted). The Court recognizes that it indicated attorneys fees would be awarded in this case in its past Order and Reasons granting summary judgment. Rec. Doc. 69 at 8. However, the Court vacated the part of its previous ruling that dealt with the application of maritime law and the awarding of attorney's fees, but did not disturb its grant of summary judgment in favor of the plaintiff. Rec. Doc. 81 at 1; Rec. Doc. 69 at 4 & 7. It affirms that decision.

### III. PAYMENT OF INVOICES FOR COMPLETED WORK

The only invoices remaining at issue in this case are invoices 988 and 1036. Neither party contests that MECS performed the work as shown in both invoices. Rec. Doc. 76 at 3. At trial, the Court heard testimony on whether MECS was entitled to collect payment for the work. The Court finds that MECS is entitled to collect payment from Cashman for the invoices in their entirety.

#### A. Compliance with Cashman Policies

Cashman claims that it is not required to pay MECS' invoices because MECS did not follow its policies including requirements (1) to obtain purchase orders before work was undertaken, (2) not to generate overtime charges for repairs without prior authorization and (3) to use Cashman labor to assist with repairs on Cashman equipment. Rec. Doc. 76 at 4.

##### 1. Purchase Orders Requirement

MECS was not given notice of Cashman's purchase order policy before the work in invoices 988 and 1036 took place. Tr. at 101 (William "Mike" Evans' testimony). The normal procedure for MECS to receive work from Cashman occurred when Mike Evans received a call from Cashman supervisors Jamie Guy or Marty Dupre. *Id.* Additionally, if MECS were doing work for Cashman and needed authorization, it would contact Shannon Guy, and she would get Jamie Guy to "okay it." Tr. at 104. MECS has also demonstrated that Cashman knew about each repair MECS undertook for Cashman. *Id.* at 101-02.

Plaintiff showed at trial that it was not Cashman's policy to issue purchase orders all the time, and when Cashman did issue purchase orders they were always issued *after* the invoice date. *See* Tr. at 15-16 (Charlene Evans' testimony); Tr. at 104 (William "Mike" Evan's testimony); Tr. at 134 (Jamie Guy's testimony); Trial Exh. C at 1. Jamie Guy conceded that he ordered the purchase order for the work done in invoice 1036 after the work was done. Tr. at 139.[3] The Court finds that Mike Evans' testimony that no one had told him to stop doing work or not do work without a purchase order was credible. Tr. at 88 & 101 (William "Mike" Evans' testimony). Mike Evans testified that he never received purchase orders before jobs for Cashman. Tr. at 88 (William "Mike" Evans' testimony). Furthermore, even if MECS' office manager was aware that there was a purchase order

---

[3]The Court finds Jamie Guy's testimony that the reason he got purchase orders after the work was done was because he works at such a fast pace to be credible. Tr. at 142.

policy, she was not aware that the purchase orders needed to be received before work was undertaken. Tr. at 26.

When Cashman refused to pay invoices for which there had been no purchase orders, Jacqui Quigg, Cashman's Accounts Payable representative, sent Charlene Evans an email on February 17, 2011 where she claimed that she had sent MECS a policy on September 1, 2010 that required approved purchase orders in advance of invoices. Trial Exh. J ("Dear Valued Customer Letter"). Quigg attached the policy to her February 17, 2011 email, but Charlene Evans testified at trial that she had never seen this document before the February 17, 2011 email. Charlene Evans also testified that Cashman had never called and told her that MECS could not do work before a purchase order was issued. Tr. at 55. The Court finds this testimony to be credible. Mike Evans also reliably testified that he had not seen the policy before the February 17, 2011 email. Tr. at 104. Cashman presented no evidence to demonstrate that it had provided the policy to MECS in September of 2010. Furthermore, neither Evans nor MECS ever signed a document agreeing to the policies in the attachment. Tr. 23-24.

### 2. Overtime Charges

MECS charged for overtime on many of its invoices. Tr. at 18-19. However, MECS is not responsible for charging overtime without authorization because it had no notice that Cashman would not pay overtime. Cashman never required MECS to agree to any

overtime policies. Tr. at 23 (Charlene Evans' testimony); Tr. at 102 (William "Mike" Evans' testimony). In fact, Cashman paid overtime without objecting on most invoices that were sent to it before this litigation began. Tr. at 19 (Charlene Evans' testimony). Cashman employees were present when MECS was working overtime on its equipment at its yard in Amelia, Louisiana. Tr. at 87 (William "Mike" Evans' testimony). No one there or in any other dealings with Cashman told Mike Evans not to work overtime. Tr. at 87 & 102 (William "Mike" Evans' testimony). Charlene Evans also testified credibly that Cashman never told her that since overtime had not been approved in a purchase order, it was not going to pay invoices. Tr. at 55. Charlene Evans explained that MECS always bills Cashman in compliance with MECS' own overtime policy. Tr. at 31. She also claimed that she sent Cashman a notification of MECS' overtime policies. Tr. at 30 (Charlene Evans' testimony). The fact that MECS occasionally gives customers a break on overtime and does not charge them does not waive MECS' ability to charge overtime. Tr. at 33.

Cashman now objects to paying overtime on invoice 988. The Court finds Cashman's objections to paying overtime to be a weak excuse not to pay MECS for the work it satisfactorily completed for Cashman. Tr. at 134 (Jamie Guy's testimony that he was generally satisfied with the work MECS did). Counsel for Cashman's tallying the hours worked on invoice 988 at trial was not informative because the invoices were unclear as to

which hours were performed before 7 a.m. and after 3 p.m. Tr. at 36-48 & 53.[4] Charlene Evans testified, "It is hard for me to tell you this is not correct, because I have not looked at this in a couple of years." Tr. at 47. Additionally, the invoices were not specific as to whether some employees that worked for MECS were charged to Cashman as mechanics or helpers. *Id.* Cashman did not object to these hours at the time of the invoice and is only bringing the overtime hours up now to add a complicating factor at trial.[5]

### 3. Cashman Labor

Cashman also claims that MECS did not follow its policy requiring MECS to use Cashman labor to assist with its repairs. MECS was not responsible for abiding by this policy because it had no notice of the policy. Tr. at 102 (William "Mike" Evans' testimony). Cashman never provided this policy in writing to MECS. *Id.* While Cashman occasionally offered to help, and did help MECS with its work, Cashman never required MECS to use its labor, and never explicitly told MECS that its policy required MECS to use its labor. *Id.*[6] In fact, Jamie Guy testified that Cashman did not physically have the crew to help MECS.

---

[4]Sometimes overtime was calculated as anything over eight hours in a day, and other times it was calculated for any hours worked before 7 a.m. and after 3 p.m. Tr. at 145 (Jamie Guy's testimony).

[5]*See, e.g.*, Cashman's unnecessary questioning about whether notice was provided to it on how Kevin S. was billed. *Id.* at 48.

[6]Additionally, the Court finds Mike Evans' testimony that MECS did not do commercially impractical repairs for Cashman because it did only the work Cashman had asked it to do to be credible. Tr. at 103.

Tr. at 143 (Guy's testimony stating that he was not able to use Cashman labor to assist MECS because he "had a small crew and they constantly stayed busy doing other things"). In essence, there was no Cashman policy for its work in the Louisiana area which required companies that fixed its equipment to use Cashman labor.

### B. Responsibility for Invoice 1036 Despite the Charter Agreement

Cashman argues that it should not have to pay for repairs to the crane on the JMC5 covered in invoice 1036 because the barge was chartered to Inland Marine and Inland Marine assumed responsibility for the charges. Rec. Doc. 90 at 2. When a problem occurred with the bearings in the house roller of the Manitowoc 4600 crane on the JMC5, Darryl Saucier, an employee of Inland Marine, called Cashman, from whom Inland Marine had chartered the JMC5 with the crane attached. Tr. at 61. Saucier could not remember at trial whether he spoke with Jamie Guy or Marty Dupre, both of whom are employed by Cashman. Tr. at 62. One of these Cashman employees informed Saucier that Mike Evans was with them and that they could send Mike Evans to him to fix the crane. *Id.* Saucier opted to pick Mike Evans up on his boat. *Id.* While Saucier picked Mike Evans up himself, he testified at trial that if he had breakdowns with the equipment Inland Marine was renting from Cashman, he would call Jamie Guy at Cashman. *Id.* at 62. The Court finds Saucier's testimony to be credible. Saucier testified that he did not agree to pay MECS, and that while he called Jamie Guy, he did not have the ability to bind Inland Marine to

contracts. Tr. at 63.

Mike Evans also testified that he specifically worked with Cashman on the repairs to the JMC5. He explained that he coordinated with Jamie Guy because they were trying to find a tug to get the equipment into Cashman's yard at Amelia for the repairs, and when they could not find one to push the vessel, they opted to do the repairs on the water. Tr. at 89 (William "Mike" Evans' testimony). The Court finds that Mike Evans' testimony that Jamie Guy told him to fix the crane and that he would take it up with Inland Marine is credible. *Id.* Defendant argues that an Inland Marine employee, Darryl Saucier, served as a contact person on invoice 1036 and that this means that Inland Marine is responsible for the invoice since all of the other invoices for work MECS did for Cashman have Cashman employees as the contact person. Tr. at 121; Trial Exh. at A-11. The Court finds that Mike Evans' explanation that Saucier signed only to verify his time is credible. Tr. at 121. Additionally, Jamie Guy is listed as the contact person on page three of that invoice and on every page the customer is listed as Cashman. Tr. at 131.[7]

The Court finds that Cashman is responsible for the work done on its crane and done at its request. Regardless of whether Cashman was present for the repairs, a Cashman

---

[7]Cashman paid for the parts that were used in this repair. Tr. at 131 (William "Mike" Evans' testimony). The Court also finds that there is no merit to Cashman's argument that Inland Marine obligated itself to pay when it signed the invoice. Tr. at 148-50. Furthermore, Inland Marine is not currently a party to this case.

representative ordered the repairs. Tr. at 69-70. MECS has already given Cashman a break on these repairs by only charging Cashman at cost for the parts that were used in the repairs. Tr. at 84-85 (William "Mike" Evans' testimony). That is 20% below the usual cost. *Id.* at 85. Cashman must pay invoice 1036.

### C. Whether the Charges for Invoice Number 988 should be Mitigated

Cashman alleges that even if it must pay invoice 988, the invoice should be for less. Rec. Doc. 90 at 1-2. Both parties admit that Mike Evans and Jamie Guy discussed the need to talk about whether the hours MECS spent on the engine repair in invoice 988 were excessive. Tr. at 88 (Testimony of William "Mike" Evans). However, Mike Evans and Jamie Guy never had the talk that they were going to have about lowering the bill. *Id.* The Court may not make a deal for Cashman over the arrangement between it and MECS. The parties had ample time to discuss settlement while this lawsuit was proceeding. The Court finds that, as Mike Evans testified, the hours on invoice 988 were the hours that were actually worked. Tr. at 88 (William "Mike" Evans' testimony); *see also* Tr. at 135 (testimony of Jamie Guy stating that MECS was working for all of the hours reflected on the invoice). Although Mike Evans conceded that Kevin S. could have done the job in less hours, he also explained that it was hard to say how long the job would take and explained "that was what [Kevin S.] was capable of. That's what he did. That's the hours he worked." Tr. at 111 (Testimony

of William "Mike" Evans).[8] Consequently, Cashman is responsible for paying the amount of the entire invoice to MECS.

## IV. COUNTERCLAIM

Cashman counterclaimed against MECS alleging that its actions constitute unfair trade practices and/or unfair or deceptive acts or practices in the conduct of any trade or commerce, under the Louisiana Unfair Trade Practices Act ("LUTPA"). La. R.S. § 51:1405, *et seq*. Cashman claimed that MECS violated LUTPA when it did not abide by Cashman's purchase order policy, charged for overtime without authorization and used outside labor rather than Cashman labor for its repairs. Rec. Doc. 19 at 7. Since the Court has found that MECS did not knowingly violate any of Cashman's aforementioned alleged policies, it denies Cashman's counterclaim.

MECS responded to Cashman's counterclaim by arguing that the claim was groundless and brought in bad faith for purposes of harassment, and that therefore, it should be awarded reasonable attorney's fees and costs under LUTPA's provision for when claims are brought in bad faith or for purposes of harassment. La. R.S. § 51:1409. Rec. Doc. 20 at 5. Cashman indicated at the pretrial conference that it would dismiss its counterclaim. Rec. Doc. 79 at 4. Presumably, it indicated this because it realized that the

---

[8]The Court also finds Mike Evans' testimony that not every job is "typical" and that he had billed for less work on this invoice than was actually worked to be credible. Tr. at 126.

claim had been brought without merit. Cashman later explained to the Court that it was not dismissing its counterclaim because MECS had informed it that it would still seek attorney's fees for the counterclaim regardless of whether the claim was dismissed prior to trial. *Id.* Cashman claimed that it would present evidence at trial of plaintiff's practices that gave rise to the counterclaim, but it did not do that. *Id.* Cashman acted in bad faith both in failing to dismiss the counterclaim and in initially filing the counterclaim in response to MECS' petition to be paid for work it had completed. It filed the counterclaim for purposes of harassment. Therefore, MECS is awarded reasonable attorneys fees and costs for defending against the counterclaim only. The proceedings of this case and a review of exhibit F indicate that little of the time plaintiff's counsel expended on this case was spent in defending against the counterclaim. However, should plaintiff's counsel submit a motion for attorney's fees for defending against the counterclaim, the motion is referred to the Magistrate Judge to apportion the amount of fees that shall be awarded.

## V. CONCLUSION

Accordingly,

IT IS ORDERED that judgment be entered in favor of the plaintiff, Mike Evans Crane Services, LLC, and against the defendant, Cashman Equipment Corp.

IT IS FURTHER ORDERED that defendant Cashman Equipment Corp. shall pay to plaintiff Mike Evans Crane Services, LLC, $123,153.73.

IT IS FURTHER ORDERED that attorney's fees shall not be awarded to plaintiff Mike Evans Crane Services, LLC for prosecuting its claim. Rec. Doc. 1.

IT IS FURTHER ORDERED that Cashman Equipment Corp.'s counterclaim is DENIED. Rec. Doc. 19.

IT IS FURTHER ORDERED that Mike Evans Crane Services, LLC is GRANTED attorney's fees based on the counterclaim only. Rec. Doc. 19.

IT IS FURTHER ORDERED that any motion from Mike Evans Crane Services, LLC to determine the amount of attorney's fees to be awarded based on the counterclaim is referred to the Magistrate Judge.

New Orleans, Louisiana, this 23rd day of September, 2013.

HELEN G. BERRIGAN
UNITED STATES DISTRICT JUDGE